UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

GERALD J. SILVA,                      :
           Plaintiff,          :
                                      :
   v.                                 :          C.A. No. 19-568JJM
                                        :
JENNIFER CLARKE,                      :
           Defendant.          :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Now pending before the Court is the motion for summary judgment of Defendant Dr.
Jennifer Clarke, who was the Medical Program Director of the Rhode Island Department of
Corrections ("RIDOC") from November 2015 through January 4, 2021. ECF No. 93; see ECF
Nos. 62-3 at 3; 93-8 ¶ 1 ("Clark Affidavit"). Dr. Clarke contends that *pro se*[1] Plaintiff Gerald
Silva, a pretrial detainee at the Adult Correctional Institutions ("ACI"), has failed to present trial-
worthy evidence based on which a factfinder could find her liable for damages caused by the
constitutional deprivation (based on the failure to provide constitutionally adequate medical
treatment as required by the Fourteenth Amendment) of which he complains. The motion
challenges the viability of the only claim left in issue, which was limned by the Court's decision
in Silva v. Rhode Island, C.A. No. 19-568JJM, 2020 WL 5258639 (D.R.I. Sept. 1, 2020),
adopted by text order (D.R.I. Sept. 16, 2020). As summarized largely in his own words, Mr.
Silva's surviving claim is as follows:

> ACI staff refused to give him Plaintiff's life sustaining medication until <u>after</u>
> Plaintiff had a major medical incident . . . for which they withheld treatment, except
> for the wrong medication until 2 ½ months <u>after</u> the incident. . . . ACI staff's ongoing
> withholding of prescribed medication resulted in a major medical heart incident

---

[1] Because Plaintiff is *pro se*, the Court has interpreted his filings liberally.  Instituto de Educacion Universal Corp. v.
U.S. Dep't of Educ., 209 F.3d 18, 23 (1st Cir. 2000).

occurring during the night of 9/21-22/19. . . .  [T]hese staff members acted under the supervision of Defendant Clarke with deliberate indifference to Plaintiff's basic Human Medical needs . . . result[ing] in a near fatal medical incident causing damage to Plaintiff's heart which poses an unreasonable risk of serious damage to Plaintiff's future health. . . .  Plaintiff did not receive a thorough evaluation until approximately 2 ½ months after the incident on 11/25/19, at which time an x-ray exhibited damage to the top of Plaintiff's heart.

Id. at *1 (emphasis in original) (internal citations and quotation marks omitted).  Dr. Clarke, in her individual capacity, is the only remaining Defendant in the case.[2]  See id. at *3 (official capacity claim against Dr. Clarke dismissed); Silva v. Rhode Island, C.A. No. 19-568JJM, 2021 WL 4775987, at *2 (D.R.I. Oct. 13, 2021), adopted by text order (D.R.I. Nov. 1, 2021) (Defendant State of Rhode dismissed at Plaintiff's request); cf. Silva v. Rhode Island, C.A. No. 19-568JJM, 2021 WL 3617103, at *2 (D.R.I. Aug. 16, 2021), adopted by text order (D.R.I. Sept. 16, 2021) (motion to designate case as class action denied).  Because Dr. Clarke is no longer the RIDOC Medical Program Director, Mr. Silva seeks only money damages.

Mr. Silva vigorously objects to the motion,[3] arguing that the evidence is sufficient for a fact finder to conclude that RIDOC medical staff supervised by Dr. Clarke unreasonably delayed

---

[2] While the State of Rhode Island was still a named Defendant in this case, the Court denied two motions for interim injunctive relief against RIDOC; these decisions address, *inter alia*, the ongoing adequacy of Mr. Silva's medical treatment after Dr. Clarke left RIDOC, including for hypertension and cardiac concerns.  Silva v. Rhode Island, C.A. No. 19-568JJM, 2021 WL 2895716, at *1 (D.R.I. July 9, 2021), adopted by text order (D.R.I. July 29, 2021); Silva v. Rhode Island, C.A. No. 19-568JJM, 2021 WL 1326885, at *6 (D.R.I. Apr. 9, 2021), adopted, 2021 WL 1734448 (D.R.I. May 3, 2021).  They are not determinative of the pending motion, which is focused on the adequacy of medical care in September 2019 and on Dr. Clarke.

[3] Just as I was preparing to issue this report and recommendation, the Clerk's Office received an unauthorized sur-reply from Mr. Silva.  ECF No. 104.  This filing should be stricken because Mr. Silva did not obtain leave of Court to file it.  DRI LR Cv 7(a)(5).  Having reviewed it, I find that some of Mr. Silva's new arguments are irrelevant to the matters in issue in that they relate solely to Mr. Silva's medical complaints regarding events that occurred after Dr. Clarke left RIDOC.  Otherwise, the sur-reply either presents the same facts and the same arguments or introduces new facts that are inconsistent with his previous factual statements.  Further, as noted *infra* in this report and recommendation, even if the Court assumes these new facts to be true, they do not give rise to material disputes to be resolved at a trial.  Procedurally, to the extent that the Court disagrees and deems these new facts to create trial-worthy factual disputes, the briefing on the motion for summary judgment must be reopened to allow Dr. Clarke an opportunity to respond to the unauthorized sur-reply.

(from September 17 to September 22, 2019)[4] in prescribing and administering blood pressure medication, resulting in a serious heart incident during the night of September 21-22, 2019; that the nurse he told about the incident did not refer him to a doctor, resulting in a two-month delay before he was evaluated; and that, when medication was provided, it was the wrong medication. Mr. Silva alleges that all of this has caused serious degeneration of his heart health, which is evidenced by a dark spot that appeared on a November 2019 x-ray, as well as by his need (a year and a half later) to add a second medication to attain adequate blood pressure control and his development of heart palpitations. ECF No. 98 at 2, 4, 8, 10, 11. Pursuant to 28 U.S.C. § 636(b)(1)(B), the motion has been referred to me for report and recommendation.

## I.    BACKGROUND[5]

### A.    Pre-RIDOC Cardiac/Hypertension Medical Treatment

Following his 2014 conviction for possession and receipt of child pornography, Mr. Silva entered the Wyatt Detention Facility ("Wyatt"). United States v. Silva, Cr. No. 13-043 S, 2014 WL 2573334, at *1 (D.R.I. June 9, 2014), aff'd, 794 F.3d 173 (1st Cir. 2015). The earliest

---

[4] Mr. Silva also complains that, after giving him one dose on September 22, 2019, RIDOC did not begin regularly dispensing blood pressure medication until September 25, 2019; however, while he asserts that this additional two-day delay (September 23-24, 2019) is actionable, he does not claim that it is causally linked to the alleged serious heart incident on September 21-22, 2019. ECF No. 98 at 2.

[5] Dr. Clarke has submitted a Statement of Undisputed Facts ("SUF"), supported by selected documents from Plaintiff's medical records, which were produced in discovery by the Wyatt Detention Facility, the Federal Bureau of Prisons and RIDOC. Dr. Clarke also relies on the parties' Interrogatory Answers, her own affidavit and that of Dr. Justin Berk, RIDOC's current Medical Program Director, and the expert opinion of Dr. Jeffrey Keller. Mr. Silva's response to Dr. Clarke's SUF contains his factual statements. In light of his pro se status, the Court has accepted these as verified and assumed them to be true (except hearsay, which was not considered), despite the lack of any declaration or affidavit averring to their truth. In addition, Mr. Silva's response to Dr. Clarke's SUF contains arguments, including citations to cases; these have been considered along with Mr. Silva's arguments in his memorandum.

medical records[6] are from the Wyatt in 2014; they reflect that Mr. Silva "states hx of HTN . . . – BP 150/90 refuses to start BP meds states he is doing well . . . monitor BP." ECF No. 95-2 at 10.

After Plaintiff was sentenced to serve seventy-two months, Silva, 794 F.3d at 177, he transferred into the custody of the Federal Bureau of Prisons ("BOP"); two BOP medical records have been submitted. First, from November 8, 2018, a record of a clinical encounter reflects that Mr. Silva's "chief complaint" was hypertension and that his blood pressure was 165/95. ECF No. 101-2 at 1. According to the physician's note, Mr. Silva stated that his prescribed blood pressure medication ("Metoprolol") was making him dizzy "so he does not always take it"; the physician discontinued Metoprolol and prescribed "Lisinopril . . . 20 mg." Id. at 1, 2.[7] Second, on Mr. Silva's release from BOP custody on May 3, 2019, a BOP nurse noted that his health problems included "Hypertension, Benign Essential," and that his prescribed medication was Lisinopril, as well as that he had been given enough to last until May 19, 2019. SUF ¶ 1, ECF No. 95-1. Mr. Silva claims that the BOP records reflecting that Metoprolol was discontinued and Lisinopril was prescribed are "in error," and that he was taking Metoprolol, not Lisinopril, at the time of release by BOP. ECF No. 99 ¶ 1.

A few days after release, on May 8, 2019, Mr. Silva was arrested by U.S. Marshals for violating release conditions and was detained at the Wyatt. United States v. Silva, CR No. 13-

---

[6] The medical records and other materials submitted in connection with the motion contain references to medical conditions other than the cardiac/blood pressure concerns that are in issue. In the interest of privacy, these are largely omitted from this report and recommendation. In addition, the records consistently reflect that Mr. Silva was advised to and took a low dose of aspirin to reduce the risk of a heart attack; because the recommendation to take aspirin is not in issue, these references also have been omitted from this factual background.

[7] In his unauthorized sur-reply, Mr. Silva alters this fact, stating that he had not failed to take his blood pressure medication and that it was the BOP physician who advised him that Metoprolol was causing dizziness and should be discontinued. ECF No. 104 at 19-20. These new facts should be disregarded because they were introduced after briefing on the summary judgment motion closed in defiance of the Local Rule. DRI LR Cv 7(a)(5). In any event, if assumed to be true, Mr. Silva's new version of this fact does not give rise to a trial-worthy factual dispute in that it simply confirms that a BOP physician opined that Metoprolol was contraindicated; otherwise, Mr. Silva's asserted factual dispute regarding his compliance or non-compliance with taking blood pressure medication while in BOP custody is not material to what is in issue on the pending motion.

43JJM, ECF No. 128 at 5 (D.R.I. July 24, 2019).  Mr. Silva states that the blood pressure medication he had been given by BOP (which he claims was Metoprolol) and his Metoprolol Information Sheet advising that the sudden stoppage of Metoprolol "could cause sudden death" were both seized on arrest.[8]  ECF Nos. 98 at 10; No. 99 ¶ 1.  During intake at the Wyatt on May 9, 2019, Mr. Silva's reported "problem list" included "HTN – Essential," while his subjectively reported medical history included "Heart Condition," "Hypertension," "Chest Pain," and "cardiac → fibrillations."  SUF ¶ 2; ECF No. 95-2 at 1-2.  His "current medication[]" was listed as "Lisinopril 20 mg."  ECF No. 95-2 at 2.  On examination, Mr. Silva's blood pressure was recorded as 138/76.  Id.  On June 5, 2019, Mr. Silva was examined by a Wyatt physician.  SUF ¶ 3; ECF No. 95-2.  His blood pressure was 140/84, Lisinopril 20 mg was prescribed, and a routine EKG ("due to h/o cardiac arrhythmias") was ordered.  ECF No. 95-2 at 4-6.  The EKG performed on June 14, 2019, was normal.  SUF ¶ 4; ECF No. 95-2 at 7-8.  Mr. Silva does not dispute the accuracy of these records from the Wyatt.

> **B.**    Cardiac/Hypertension Medical Treatment Provided by RIDOC

Mr. Silva was released from federal custody at the Wyatt on September 16, 2019, and was immediately taken into state custody pursuant to an arrest warrant for failing to register as a sex offender.  Silva v. Rhode Island, C.A. No. 19-568JJM, 2021 WL 1085408, at *2 (D.R.I. Mar. 22, 2021), adopted, 2021 WL 1734448 (D.R.I. May 3, 2021).  On September 17, 2019, Mr. Silva had an intake meeting with a RIDOC nurse at the ACI.  SUF ¶ 5; ECF No. 95-3 at 1-5.  Her notes reflect that Mr. Silva told her he had a history of "A-Fib. & Heart Palpitations" and he was taking a blood pressure medication but could not recall the name or dosage; she recorded that "BP med need to be verify @ Wyatt Prison."  Id. at 1-2, 5.  The nurse ordered a "history and

---

[8] Dr. Clarke correctly notes that Mr. Silva's statement regarding the content of the "Metoprolol Information Sheet" is hearsay that cannot be considered at summary judgment.  For that reason, it has not been considered.

physical" with a physician as "Priority 1."  SUF ¶ 6; ECF No. 95-3 at 5.  Mr. Silva denied pain;

on examination, his blood pressure was 154/84.  ECF No. 95-3 at 2, 3.  Dr. Clarke's affidavit

confirms that the nurse's delay in prescribing medication until verification of the existing

prescription from the prior prescriber is consistent with RIDOC's intake protocol to avoid

medication errors, as well as that this protocol generally results in medication arriving within

three days.  Clark Affidavit ¶¶ 4-6.  This protocol is printed on the nurse intake form and

specifically applies to blood pressure medication: "[i]f inmate does not know the name(s) of the

medication, write the type in the indication column, and complete the form after the med is

verified.  E.g. Blood Pressure Pill."  ECF No. 95-3 at 1.  Mr. Silva assents to the accuracy of

these records, adding only that he told that nurse that he thought he was taking "metro-

something."[9]  ECF No. 99 ¶ 5.

One day later, on September 18, 2019, Dr. Daniel Valicenti performed the ordered

"Priority 1" history and physical.  SUF ¶¶ 6-7; ECF No. 95-3 at 6.  The physical examination

notes reflect regular heart rate and pulse rhythm, and normal cardiac findings, with no current

pain except in the right leg.  ECF No. 95-3 at 6-8.  Mr. Silva reported a history of hypertension

and palpitations for which he had been prescribed "rate control medicines," as well as that he had

been seen by "cardiology . . .  in 2016 and was referred for extensive testing including

ECHO/ETT which were not done due to transfer."  ECF No. 95-3 at 7.  Dr. Valicenti diagnosed

hypertension and instructed RIDOC medical staff that Mr. Silva should "resume meds/review

summary/transfer paper work."[10]  ECF No. 95-3 at 8.  Mr. Silva does not dispute the accuracy of

---

[9] In his unauthorized sur-reply, Mr. Silva introduces a new and contradictory version of this fact, claiming that he
affirmatively requested Metoprolol and advised both the intake nurse and Dr. Valicenti that Lisinopril had been
"counterproductive."  ECF No. 104 at 10, 12, 18-19.  This new fact should be disregarded for the reasons stated
*infra* in note 14.

[10] It is undisputed that the "transfer paper work" to which Dr. Valicenti refers did not turn up in discovery,
permitting the inference that RIDOC lost it or the Wyatt had failed to prepare or provide it.  See SUF ¶ 7 n.3.

this record, arguing only that he disagrees with Dr. Valicenti's medical opinion that RIDOC staff should follow the protocol of waiting for information from the Wyatt regarding what blood pressure medication had previously been prescribed.  ECF No. 99 ¶ 7.  Mr. Silva asserts that Dr. Valicenti should have taken the initiative to prescribe something without knowing what Mr. Silva had been taking; he presents no medical opinion to buttress this conclusion.  Id.

There are no records reflecting what, if anything, was done from September 18 through September 20, 2019, to verify what blood pressure medication Mr. Silva had been prescribed by the Wyatt or to monitor Mr. Silva's blood pressure.  Mr. Silva states that he appeared daily at the ACI's "4:00 pm medline" requesting the blood pressure medication.  ECF No. 98 at 2.  On September 21, 2019, Mr. Silva made the written request "[t]hat I receive my high blood pressure medication immediately," because he had been without "this critical medication since my arrival on 9/16/19."  SUF ¶ 8; ECF No. 95-3 at 9.  RIDOC's same-day response indicates that "orders placed for both med verification & BP monitoring."  ECF No. 95-3 at 9.  On the evening of September 21, 2019, a RIDOC nurse made a "chart maintenance" notation confirming that there were signed orders to verify Mr. Silva's medication and to monitor his blood pressure.  Id. at 10. Mr. Silva alleges that the order for blood pressure monitoring was not followed.

On the following day, September 22, 2019, RIDOC records reflect that, between 10:56 and 11:13 a.m., a nurse noted that verification had been received "on Re-Attempt" from the Wyatt that Mr. Silva had been prescribed "Lisinopril 20 mg at 8am"; Lisinopril was ordered. SUF ¶ 9; ECF No. 95-3 at 11-13.  An hour later, at 12:12 pm on September 22, a different RIDOC nurse recorded her encounter with Mr. Silva: "Seen this AM for BP check, slightly elevated, meds verified from [Wyatt], BP med given @ 12 pm."  ECF No. 95-3 at 14.  This record indicates that the nurse took "[c]urrent [v]ital [s]igns," including blood pressure, pulse

rate and rhythm, respiration and pulse oxygen.  Id.  All were normal except for blood pressure

(162/90), for which she dispensed medication.  Id.  This record does not mention a report of a

heart incident occurring during the preceding night of September 21-22, 2019; it reflects "None

Reported" for "New/Additional Complaint."  Id.

  Mr. Silva's interrogatory answers claim that this record omits his report to this nurse that,

during the preceding night, he had experienced "intense compression of the heart accompanied

by suffocation and extreme pain streaking throughout the body, limbs, and neck creating a

paralysis of the body," as well as her response that she was confused by the word "suffocation."

ECF No. 93-6 at Response Nos. 8, 9, 13; see ECF No. 99 ¶ 9.  Mr. Silva also alleges that "the

attending [n]urse" on September 22, 2019, told him that RIDOC staff had failed to contact the

Wyatt and she did not know why.  ECF No. 99 ¶ 9.  Further, after blood pressure medication was

dispensed on September 22, 2019, Mr. Silva did not begin to receive it regularly for two more

days, until September 25, 2019.  That is, he was without his blood pressure medication again on

September 23 and 24, 2019, despite RIDOC staff having been made aware of what the nurse was

told on September 22, 2019.  ECF No. 98 at 2.

  The next record is a handwritten request from Mr. Silva dated October 14, 2019, in which

he lists his open medical issues, ranging from lactose intolerance to ear concerns.  SUF ¶ 10;

ECF No. 95-3 at 15.  As pertinent here, it states only, "I believe that I am due for a . . . chest

xray."  Id.  It does not mention a major cardiac episode on September 21-22, 2019.  On October

29, 2019, Mr. Silva followed-up in writing, asking, "I'm sure that you are aware that I am

waiting for responses to my requests for . . . EKG, assessment[] for . . . a Pacemaker, change of

medications"; RIDOC's handwritten response states, "10/30/19 – NSC" (Nurse Sick Call).  SUF

¶ 11; ECF No. 95-3 at 16.  This note makes no reference to a major cardiac episode on

September 21-22, 2019.  On November 17, 2019, Mr. Silva elevated his medical concerns to Dr.

Clarke as a "Grievance," complaining that "your staff has been failing to consistently provide me

with my life sustaining HBP [m]edication and has stated on 11/2 & 11/3 that I will <u>not</u> receive

any additional medical tx . . . for my deteriorating medical condition until I am sentenced,"

alleging that this is a "blatant violation of my 8th [a]mendment [r]ights."  SUF ¶ 12; ECF No. 95-

3 at 17.  This document also does not mention a major cardiac episode on September 21-22,

2019.  RIDOC's response indicates that Mr. Silva was on the list to see the physician again as

"priority level 2."  SUF ¶ 12 & n.5; ECF No. 95-3 at 17.

A week later, on November 25, 2019, Mr. Silva had another appointment with Dr.

Valicenti.  SUF ¶ 14; ECF No. 95-3 at 24.  Dr. Valicenti performed a physical examination,

which yielded findings of blood pressure of 132/80, good oxygen saturation and normal cardiac

observations.  ECF No. 95-3 at 24-25.  Noting Mr. Silva's reported history of "palpitations, CP,

and DOE," and his requests for a chest x-ray and EKG, Dr. Valicenti placed orders for the

continuation of Lisinopril, annual laboratory tests, an EKG and a chest x-ray; he also "reassured"

Mr. Silva.  <u>Id.</u>  Mr. Silva claims that Dr. Valicenti failed to record that Mr. Silva asked to be

switched to Metoprolol at this encounter, as well as that he "discussed the medical incident on

9/21-22/19 with Dr. Valicenti."  ECF No. 99 ¶ 14.

The ordered x-ray was performed immediately and was interpreted the next day by a

radiologist, who opined that it showed "no active disease."  SUF ¶ 15; ECF No. 95-3 at 26.  Mr.

Silva claims that he was told that x-rays are not read by a physician "if there was nothing wrong

with them," based on which, he "concludes" that this x-ray must have shown something wrong

because it was interpreted by a radiologist.  ECF No. 99 ¶ 15.  The EKG was done three days

later; it was also interpreted as within "normal limits."  SUF ¶ 16; ECF No. 95-3 at 27-28.  In

connection with the EKG, Mr. Silva had a physical examination performed by a nurse, who noted that his blood pressure was 123/68 and that he was "feeling good"; she instructed him to report any symptoms of chest pain, shortness of breath or distress immediately.  ECF No. 95-3 at 27.  Soon after the EKG and chest x-ray were performed, on December 5, 2019, Mr. Silva acknowledged that "my multiple medical issues appear to be in remission, at least partially," and asked RIDOC to start him on physical therapy.  SUF ¶ 17; ECF No. 95-3 at 29.

Mr. Silva wrote a letter to Dr. Clarke dated December 17, 2019.  ECF No. 95-4.  It references his conversation with Dr. Clarke on November 25, 2019 (the same day Mr. Silva had the second appointment with Dr. Valicenti).  Id. at 1.  The letter states:

> My understanding is that we agreed to work together to coordinate my recovery from the major heart ailment that I experienced on 9/21-22/19 as a result of this facility's failure to provide me with my life sustaining medication and to provide preventative care to ensure that this medical episode, or worse, does not reoccur.

Id.  This is the first reference in any document to a "major heart" episode on September 21-22, 2019.  In the letter, Mr. Silva advises that he looked at his x-ray himself and noticed a "'dark spot' sitting on the top of my heart where my chest pain is concentrated."  ECF No. 95-4 at 2.  The letter acknowledges Mr. Silva's view that Dr. Clarke made a "good faith effort."  Id. at 1.

On January 8, 2020, a brief unsigned handwritten response indicates that physical therapy had been ordered, an eye examination would be scheduled and that it "appears your issues have been resolved."  SUF ¶ 20; ECF No. 95-4 at 4.  On January 17, 2020, Mr. Silva was seen by a physician assistant who performed a physical examination; his blood pressure was 110/70, he was well-appearing with no pain; his cardiac and lung observations were normal.  SUF ¶21; ECF No. 95-3 at 30-31.  During this appointment, Mr. Silva reported shortness of breath when climbing stairs and said he would "like to restart Metoprolol," but also told the physician

assistant that "he was told he cannot be on [M]etroprolol but is unsure why."[11]  ECF No. 95-3 at

31.  The physician assistant ordered an echocardiogram and follow-up with cardiology; her

comments note that Mr. Silva should continue on Lisinopril but consider decreasing it if his

blood pressure is consistently low, as well as that Metoprolol should not be prescribed until after

a cardiology consultation about why he was told not to take it.  Id. at 31.  This is the first RIDOC

record reflecting Mr. Silva's request for Metoprolol.

A year later, on February 19, 2021, Mr. Silva again was seen by Dr. Valicenti; he told Dr.

Valicenti that his prior chest x-ray had been abnormal, that he was experiencing chest pain and

that "he had cardiac suffocation in 2019 was not evaluated in ED."  SUF ¶ 25; ECF No. 95-3 at

38-39.  On physical examination, Dr. Valicenti noted blood pressure of 154/90, no apparent

distress, and made normal cardiac findings.  ECF No. 95-3 at 39.  Dr. Valicenti opined that the

chest pain "doesn't sound anginal, cardiac," but that tests should be performed to rule out

ischemia and dysrhythmias.  Id. at 40.  He added a prescription for Metoprolol, in addition to

Lisinopril, to bring down the blood pressure, ordered an EKG, chest x-ray, exercise tolerance

test, echocardiogram and Holter monitor.  Id.  The x-ray was done the same day.  SUF ¶ 26; ECF

No. 95-3 at 41.  Despite the finding that the "lungs are underexpanded," the radiologist opined,

"no acute chest disease."  ECF No. 95-3 at 41.  An EKG performed on February 24, 2021,

reflects "[a]bnormal" but also that its interpretation may be adversely affected by "[p]oor data

quality."  SUF ¶ 27; ECF No. 95-3 at 42.  The affidavit of Dr. Justin Berk includes his clinical

interpretation of this EKG:

> EKG showed no signs of myocardial infarction ("heart attack") or arrythmias
> though the computer read this as a possible junctional rhythm.  The physician noted
> stable (not new) non-pathological Q waves, were seen in leads II and aVF.  These
> were not concerning findings and likely a normal variation in an EKG.

---

[11] As noted supra, a BOP record from 2018 indicates that a BOP physician opined that "[t]he dizzy feeling is likely
a result of the medication" and discontinued Metoprolol, switching Mr. Silva to Lisinopril.  ECF No. 101-2 at 2.

ECF No. 48.  Id. ¶ 2(a).  By the time of the stress test on June 7, 2021, Mr. Silva's blood pressure was 133/79.  ECF No. 95-3 at 43.  The stress test result was "[n]ormal," with normal sinus rhythm and "[n]o evidence of exercise induced ischemia."  SUF ¶ 28; ECF No. 95-3 at 43.

At the end of his response to Dr. Clarke's SUF, Mr. Silva added new facts based on the heart monitoring testing ordered by Dr. Valicenti.  ECF No. 99 ¶ 29.  He states that the monitoring was conducted in April 2021, but required "reset" after "multiple heart 'episodes,'" resulting in "recoverable data" that Mr. Silva reviewed himself; his interpretation is that it "confirmed that Plaintiff has Heart Palpitations."  Id. (emphasis in original).  Mr. Silva alleges that the test was repeated in May 2021, after which one of the blood pressure medications was discontinued; when Mr. Silva protested, that medication was restarted.  Id.  Dr. Clarke did not respond to Mr. Silva's new facts.[12]

C.     Opinions of Physicians Regarding Mr. Silva's Cardiac/Hypertension Treatment

Three physicians have examined the records reflecting Mr. Silva's medical treatment by RIDOC.

First, in Interrogatory Answers, Dr. Clarke avers that "[t]here is no indication in the record that Mr. Silva suffered a major heart incident and his chest x-ray, EKG and blood work were all within normal limits," as well as that, "I recall that when I reviewed Mr. Siva's [sic] records, it appeared that his medical needs were appropriately addressed."  ECF No. 93-7 at 5, 7.

Second, Dr. Justin Berk, the present Acting Medical Program Director for RIDOC, submitted an affidavit in support of RIDOC's opposition to Mr. Silva's motion for an interim injunction.  Dr. Berk reviewed RIDOC's treatment records of Mr. Silva's diagnoses of atypical

---

[12] Having left RIDOC in January 2021, by the time of these events, Dr. Clarke was no longer the RIDOC Medical Program Director.  Clarke Affidavit ¶ 1.

chest pain, heart palpitations and hypertension going back to records from 2019 and opined that "Mr. Silva's condition is not consistent with myocardial infarction" and that his treatment plan has been "appropriate and reasonable."  ECF No. 48 ¶¶ 2(a), 4.

Third, Dr. Jeffrey Keller was identified as Dr. Clarke's testifying expert concerning medically acceptable treatment standards for hypertension and to offer the following medical opinions: (1) the medical record contains no evidence of any pre-RIDOC heart condition other than hypertension for which Lisinopril had been prescribed at a "starter dose" for mild hypertension; (2) the medical record contains nothing reflecting a cardiac medical event on September 21-22, 2019; and (3) the medical record contains nothing reflecting damage to Mr. Silva's heart.  ECF No. 90 at 2.  In his report, Dr. Keller opined that there is nothing in the medical records reflecting a major medical heart incident occurring during the night of 9/21-22/19.  Id. ¶¶ 3(b), 4(b).  Regarding Mr. Silva's statement that there was a dark spot on the November 2019 x-ray evidencing heart damage, Dr. Keller noted that the x-ray was interpreted by the radiologist as normal and opined that Mr. Silva's assertion that the chest x-ray was abnormal is false.  Id. ¶¶ 3(d), 4(c).  Finally, based on his file review and medical expertise, Dr. Keller opined that Mr. Silva received "exemplary medical care" while in RIDOC custody.  Id. ¶ 4(f); see ¶ 3(f).

No contrary opinions have been submitted.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve

the issue in favor of either party." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted). "Facts are material when they have the potential to affect the outcome of the suit under the applicable law." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (internal quotation marks omitted). The party opposing summary judgment bears "'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" Joseph v. Lincare, Inc., 989 F.3d 147, 157 (1st Cir. 2021) (quoting Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003)). Summary judgment should be granted if the evidence is such that no reasonable jury could return a verdict in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); see Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

In a § 1983 case based on the alleged failure to provide constitutionally adequate medical treatment, summary judgment may not be granted solely because the non-moving party has failed to proffer an expert opinion. Silva v. Rhode Island, No. CV 19-568JJM, 2021 WL 4712289, at *1 (D.R.I. Sept. 14, 2021) (constitutional claim of unreasonable health care pursuant to § 1983 does not necessarily require expert testimony) (citing King v. Patt, 525 F. App'x 713, 721-22 (10th Cir. 2013)) (expert testimony is not required when jury can determine from non-expert evidence whether delay in medical care caused harm); Rogers v. Town of New Hampton, No. 19-cv-118-JL, 2021 WL 3570410, at *4 (D.N.H. Aug. 12, 2021) (expert testimony not required to support § 1983 allegation of failure to treat serious medical need). However, if the medical determinations to be made by a fact finder – for example, whether an alleged constitutional violation caused an adverse medical consequence – are complex and not within a

layperson's competence, the lack of expert evidence can be fatal at the summary judgment phase. Daggett v. York Cty., No. 2:18-CV-00303-JAW, 2021 WL 868713, at *37-39 (D. Me. Mar. 8, 2021) (expert needed to address "the Gordian Knot of [medical] causation"; with no expert to opine to medical causation, summary judgment on § 1983 claim granted despite failure to correctly administer Parkinson's medication), aff'd, No. 21-1374, 2022 WL 216565 (1st Cir. Jan. 25, 2022).

At the summary judgment phase, the Court should disregard hearsay in determining whether proffered evidence should be considered. Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990). However, if a detainee proffers the declaration of a nurse or other health care provider who potentially was an agent, or in the employ, of the opposing party, it should not be considered hearsay because it is likely the statement of a party opponent pursuant to Fed. R. Evid. 801(d)(2). See Daggett, 2021 WL 868713, at *35 ("Viewing the facts in the light most favorable to [plaintiff], the implication is that the charge nurse was [defendant's] employee. As such, her statements are non-hearsay because they are opposing party statements.").

## III. APPLICABLE § 1983 LAW REGARDING CONSTITUTIONALLY SUFFICENT MEDICAL TREATMENT

A threshold question for the Court: what is the appropriate standard to apply to Mr. Silva's claim? While he has framed his arguments as grounded in the Eighth Amendment, as a pretrial detainee in state custody, Mr. Silva's constitutional right to adequate medical care derives from his right under the Due Process Clause of the Fourteenth Amendment to be free of punishment. Surprenant v. Rivas, 424 F.3d 5, 18 (1st Cir. 2005); see Spencer v. City of Boston, Civil Action No. 13-11528-MBB, 2015 WL 6870044, at *7 (D. Mass. Nov. 6, 2015) ("constitutional violations based on denied or inadequate medical care brought by pretrial

detainees are analyzed under the substantive component of the Due Process Clause of the Fourteenth Amendment").

Since Kingsley v. Hendrickson, 576 U.S. 389 (2015), it has been unclear whether this right means that a pretrial detainee asserting that he has been denied adequate medical care must show deliberate indifference as required by the Eighth Amendment, or merely that the conduct "purposely or knowingly used against him was objectively unreasonable." Id. at 397; see Gomes v. U.S. Dep't of Homeland Sec., 460 F. Supp. 3d 132, 145-148 (D.N.H. 2020) (noting Circuit split in that Second, Seventh, and Ninth Circuits have adopted an objective test requiring reckless disregard, while Fifth, Eighth, and Eleventh Circuits have held that Kingsley does not extend to detainee medical care claims); see also Rancourt v. Hillsborough Cty., Case No. 20-cv-351-PB, 2022 WL 344812, at *3 (D.N.H. Feb. 4, 2022) (noting circuit split).  While this Court has applied the objective reasonableness standard to a *civil* detainee's medical claim, Medeiros v. Martin, 458 F. Supp. 3d 122, 128 & 128 n.1 (D.R.I. May 1, 2020), following Kingsley, the First Circuit has continued to apply the Eighth Amendment test to detainee claims of inadequate medical care.  Rancourt, 2022 WL 344812, at *3 (citing Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) and Miranda-Rivera v. Toledo-Davila, 813 F.3d 64 (1st Cir. 2016)).  District courts in this Circuit have done the same.  E.g., De La Cruz v. Martin, C.A. No. 21-049-JJM-PAS, 2021 WL 1293449, at *2 n.1 (D.R.I. Apr. 7, 2021) (applying Eighth Amendment standard to pretrial detainee claim of inadequate medical care); Daggett, 2021 WL 868713, at *33-37 (same); Vick v. Moore, Civil No. 19-cv-267-SJM-AKJ, 2019 WL 7568227, at *5-6 (D.R.I. Oct. 11, 2019) (same), adopted, 2020 WL 161023 (D.R.I. Jan. 13, 2020).  In light of controlling precedent (Zingg and Miranda-Rivera) and mindful that neither Mr. Silva nor Dr. Clarke has

argued that the Court should apply the objective test,[13] the Court will apply the traditional Eighth Amendment two-part objective/subjective standard.  See Est. of Nicholas Sacco v. Hillsborough Cty. House of Corrs., Civil No. 1:20-cv-447-JL, 2021 WL 2012639, at *5 (D.N.H. May 20, 2021).

Viewed through this Eighth Amendment lens, a plaintiff alleging inadequate medical care must prove "deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  To do so, he must satisfy a two-prong test.  Abernathy v. Anderson, 984 F.3d 1, 6 (1st Cir. 2020) (per curiam).

For Prong One, the claimant must show, "as an objective matter, that he has a serious medical need[] that received inadequate care."  Abernathy, 984 F.3d at 6 (internal quotation marks omitted).  A serious medical need is one that involves a substantial risk of serious harm if it is not adequately treated.  Barrett v. Coplan, 292 F. Supp. 2d 281, 285 (D.N.H. 2003); see Gaudreault v. Mun'y of Salem, 923 F.2d 203, 208 (1st Cir. 1990) (defining a serious medical need as one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"). Adequate medical care is treatment by qualified medical personnel who provide services that are based on medical considerations and are of a quality acceptable to the prudent professional standards in the community, tailored to an inmate's particular medical needs.  United States v. DeCologero, 821 F.2d 39, 42-43 (1st Cir. 1987); Barrett, 292 F. Supp. 2d at 285.  This is not the "most sophisticated care" available; nor is it "care that is ideal, or of the prisoner's choosing." Kosilek v. Spencer, 774 F.3d 63, 82, 85 (1st Cir. 2014) (internal quotation marks omitted) (constitution proscribes treatment that shocks the conscience); see Layne v. Vinzant, 657 F.2d

---

[13] Dr. Clarke adverts to the objective test, but her arguments rely on the traditional Eighth Amendment test; Mr. Silva relies exclusively on the traditional Eighth Amendment test.  ECF Nos. 93-1; 98; 99; 101.

468, 474 (1st Cir. 1981) (where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments") (internal quotation marks omitted).

Prong Two is subjective. Abernathy, 984 F.3d at 6. It mandates that the claimant must demonstrate that a responsible prison official was aware of the serious need for treatment, or of the facts from which the need could be inferred, and still failed to provide treatment. Barrett, 292 F. Supp. 2d at 285. "Deliberate indifference" requires a showing of "greater culpability than negligence but less than a purpose to do harm" and it may "consist of showing a conscious failure to provide medical services where they would be reasonably appropriate." Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011). "To show such a state of mind, the plaintiff must provide evidence that the defendant had actual knowledge of impending harm, easily preventable, and yet failed to take the steps that would have easily prevented the harm." Zingg, 907 F.3d at 635 (citation and internal quotation marks omitted).

IV.    **ANALYSIS**

A.    <u>Prong One – Inadequate Care for a Serious Medical Need</u>

The Court begins by examining whether Mr. Silva has proffered facts sufficient for a fact finder to conclude that he had an objectively serious medical need for which adequate care was not provided. See Abernathy, 984 F.3d at 6. Construed in the light most favorable to Mr. Silva and drawing all inferences in his favor, the evidence is more than sufficient to permit the finding that he arrived at RIDOC from the Wyatt suffering from hypertension, a serious medical condition, for which blood pressure medication (Lisinopril) had been prescribed. Baskerville v. Blot, 224 F. Supp. 2d 723, 735 (S.D.N.Y. 2002) (prescription for high blood pressure arguably indicates that claimant may have objectively serious medical condition that needed to be

controlled through medication).  And it is undisputed that there was a delay of five days – from September 17, 2019, until noon on September 22, 2019 – when the first dose of Lisinopril was administered, as well as that this delay was followed by two more days of delay until Mr. Silva began regularly to receive Lisinopril on September 25, 2019.  Further, at the summary judgment phase, the Court accepts as true Mr. Silva's averments (1) that a nurse told him that no one had tried to contact the Wyatt to verify his blood pressure medication; and (2) that Mr. Silva told the nurse he saw on September 22, 2019, that, during the previous night, he had experienced "intense compression of the heart," "suffocation," "extreme pain," and "paralysis" and that, while she took his vital signs (including normal pulse rate and rhythm, respiration and oxygen intake, but elevated blood pressure) and administered his blood pressure medication, her only response to his reported symptoms was to tell him that "suffocation" confused her.  ECF No. 93-6 at Response Nos. 8, 9, 13.  It is undisputed that a delay of two months followed before a full cardiac evaluation was performed by Dr. Valicenti (on November 25, 2019).

To clear Prong One, Mr. Silva must present sufficient evidence for a fact finder to conclude that either of these delays constituted a serious denial of adequate medical care. Further, when the seriousness of the affliction is non-obvious, <u>Blackmore v. Kalamazoo Cty.</u>, 390 F.3d 890, 898 (6th Cir. 2004), "an inmate who complains that delay in medical treatment rose to a constitutional violation *must* place verifying medical evidence in the record to establish the *detrimental effect* of the delay." <u>Shepard v. McClosky</u>, C.A. No. 16-407-JJM-LDA, 2018 WL 5281419, at *3 (D.R.I. Oct. 24, 2018) (emphasis in original) (quoting <u>Napier v. Madison Cty., Ky.</u>, 238 F.3d 739, 742 (6th Cir. 2001)), <u>aff'd</u>, No. 18-2137, 2019 WL 10852814 (1st Cir. Dec. 9, 2019).  That is, there must be evidence that the delay is, "in objective terms, sufficiently serious." <u>Compare</u> <u>Smith v. Carpenter</u>, 316 F.3d 178, 185 (2d Cir. 2003) (internal quotation

marks omitted) (multi-day interruptions in HIV medication not constitutionally inadequate treatment without evidence that delay was likely to or did cause concrete injury), with Stevens v. Lynch, No. 07-cv-277-PB, 2007 WL 4056965, at *1-4 (D.N.H. Nov. 14, 2007) (open-ended delay in prescribing Hepatitis C medication until liver damage advances states viable claim of constitutionally inadequate care), adopted in part, 2007 WL 4284907 (D.N.H. Dec. 3, 2007).

Regarding the first delay (in administering blood pressure medication), it is undisputed that, at intake, Mr. Silva made RIDOC staff aware of his active diagnosis of high blood pressure and his claimed history of potentially more serious ("A-Fib, & Heart Palpitations") cardiac symptoms, as well as that he was taking prescribed blood pressure medication.  It is further undisputed that Mr. Silva arrived at the ACI from the Wyatt with no medication and no transfer paperwork and he could not accurately name the medication he had been prescribed.[14]  Also undisputed is what the intake nurse did: (1) she immediately referred Mr. Silva to be seen by a physician; (2) she took his blood pressure to get a baseline measurement; and (3) she followed

---

[14] In his opposition to the summary judgment motion, Mr. Silva claimed he told the nurse only that he thought it was "metro-something."  ECF No. 99 ¶ 5.  In his unauthorized sur-reply, Mr. Silva changed this fact, claiming that he affirmatively requested Metoprolol and advised both the intake nurse and Dr. Valicenti that Lisinopril had been "counterproductive."  ECF No. 104 at 10, 12, 18-19.  The Court should disregard this new version of the fact both because the sur-reply is unauthorized and because a litigant cannot contradict his own prior statement to evade summary judgment.  See Cole v. Goord, No. 04 Civ. 8906 (GEL), 2009 WL 1181295, at *11 (S.D.N.Y. April 30, 2009) (litigants cannot manufacture issues of fact by raising new allegations in response to summary judgment), aff'd, 379 F. App'x 28 (2d Cir. 2010); Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994) ("[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed").  Even if the Court were to accept this new version as true, it cannot overcome the absence of verifiable medical evidence that RIDOC's medical judgment to prescribe Lisinopril instead of Metoprolol was objectively unreasonable care administered in disregard of a serious medical need.  See Richardson v. Corr. Med. Care, Inc., 9:17 CV-420 (MAD/ATB), 2021 WL 6775905, at *10 (N.D.N.Y. Jan. 14, 2021) (where prisoner received medical treatment, deliberate indifference will be found only where medical attention rendered is so woefully inadequate as to amount to no treatment at all), appeal docketed, No. 22-210 (2d Cir. Feb. 1, 2022); see also Layne, 657 F.2d at 474 (where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments") (internal quotation marks omitted).  Mr. Silva's new version of the facts also fails to give rise to a trial-worthy dispute because it amounts to nothing more than Mr. Silva's disagreement with the medical judgment of treatment providers, which is not actionable.  Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993) (disagreement with medical provider over course of treatment generally does not rise to Eighth Amendment violation); Shepard, 2018 WL 5281419, at *3.

20

the RIDOC medical protocol of not prescribing blood pressure medication until obtaining

verification of the medication and dosage previously prescribed and noted the need to get

verification.  Based on her actions, by the next day, Mr. Silva had a full examination (including

cardiac function) performed by Dr. Valicenti, who was made aware both of Mr. Silva's history

and of the intake nurse's decision to follow the protocol and postpone the prescription of blood

pressure medication until verification from the Wyatt.  There is no evidence permitting the

inference that RIDOC's protocol or its application in Mr. Silva's circumstances, based on Dr.

Valicenti's physical examination, amounted to inadequate medical care.  Mr. Silva's lay opinion

that Dr. Valicenti's medical judgment was wrong and that he should have prescribed something

without any further delay, despite not knowing what Mr. Silva had been taking, is not competent

evidence because Mr. Silva is not qualified to offer such an opinion.  See Daggett, 2021 WL

868713, at *36 (reasonable for jail staff to follow advice of physician instead of accepting

statement of plaintiff's friend regarding what medication he should be taking).

What happened next is where a fact finder might well conclude that RIDOC stumbled.

That is, the evidence permits the inference that, for three days after the examination by Dr.

Valicenti, until September 21, 2019, when Mr. Silva complained in writing, a jury could find that

RIDOC staff failed to do anything about getting in contact with the Wyatt to confirm Mr. Silva's

medication.  This conclusion is supported by Mr. Silva's claim that a nurse told him no one had

contacted the Wyatt and she did not know why.  Also unexplained is RIDOC staff's failure to

dispense Lisinopril for two additional days (September 23 and 24, 2019) after giving Mr. Silva

his first Lisinopril dose on September 22, 2019.

One problem is that there is nothing to permit the inference that RIDOC's delay at intake

in getting Mr. Silva back on previously prescribed blood pressure medication was anything more

than ordinary negligence.  Rua v. Glodis, 52 F. Supp. 3d 84, 95 (D. Mass. 2014) (inadvertent or negligent failure to provide adequate medical care to detainee does not amount to constitutional violation), aff'd, No. 14-2158 (1st Cir. Dec. 21, 2015); Steele v. Langley, Civil Action No. 07-00422-KD-B, 2009 WL 424588, at *7 (S.D. Ala. Feb. 17, 2009) (negligence in failing to administer blood pressure medication for four months is not sufficient to support a constitutional claim without proof of harm caused by delay).  The other problem – fatal for clearing Prong One at the summary judgment phase – is the lack of an opinion from a qualified medical expert to establish that such a delay was unreasonably dangerous or that the delay caused the serious cardiac event that Mr. Silva alleges occurred during the night of September 21-22, 2019, or any other medically verifiable adverse consequence.[15]  See Daggett, 2021 WL 868713, at 37-39 (medical expert needed to opine on medical causation).  Based on the foregoing, I find that Mr. Silva's first claim of delay (in administering blood pressure medication) lacks sufficient substance to proceed to a fact finder.

Mr. Silva's second claimed delay – two months between his description of serious symptoms to a nurse on September 22, 2019, until his second examination by Dr. Valicenti on November 25, 2019 – might be troublesome, but for the undisputed evidence that, whatever symptoms Mr. Silva may have described to the nurse (and the Court assumes he reported

---

[15] Mr. Silva avers that, while he was in BOP custody, an unnamed BOP physician told him "that not taking the H.B.P. is not an option."  ECF No. 98 at 10 (emphasis in original).  There are two problems with this statement as support for the proposition that Mr. Silva was unreasonably exposed to a serious medical risk by RIDOC's delay in contacting the Wyatt to verify his blood pressure medication or in failing to dispense Lisinopril on September 23-24, 2019.  First, as Dr. Clarke argues, this statement is hearsay that cannot be considered at the summary judgment phase.  And second, the statement does not support the proposition that RIDOC's delay in dispensing blood pressure medication posed an unreasonable risk.  See Norwood v. Ghosh, 723 F. App'x 357, 366 (7th Cir. 2018) (expert testimony that delays "could have" resulted in condition "falls short of verifying medical evidence that would allow a reasonable jury to find by a preponderance of the evidence that such causation actually occurred").

extremely serious symptoms),[16] there was no delay in examination and treatment in that this

nurse <u>did</u> perform an examination and <u>did</u> provide treatment.  Specifically, she took vital signs,

yielding all normal results, except for elevated blood pressure, for which she administered blood

pressure medication.  That Mr. Silva "simply disagree[s]" with her assessment of his medical

needs does not give rise to a constitutional deprivation.  <u>Shepard</u>, 2018 WL 5281419, at *3

(RIDOC's motion for summary judgment granted where plaintiff alleged disagreement with

medical assessment of nurses who took vital signs but delayed sending him to hospital); <u>Morphis</u>

<u>v. Smith</u>, Civil No. 2:14-CV-02027-MEF, 2017 WL 1128463, at *11 (W.D. Ark. Mar. 24, 2017)

(bench trial verdict in favor of prison officials, despite almost two month delay in cardiac

examination by physician, based on evidence that when plaintiff reported symptoms of heart

attack, EMTs performed examination and stated he appeared "fine").  Further, there is no

evidence permitting the inference that the nurse's assessment that Mr. Silva did not need to see

the doctor violated some standard of care.  <u>Shepard</u>, 2018 WL 5281419, at *3.  Nor is there any

evidence permitting the inference that this delay caused any concrete injury.  This absence of

proof is confirmed by the next undisputed record, Mr. Silva's note (in his handwriting) written

three weeks later, which catalogs his unaddressed medical needs, ECF No. 95-3 at 15, and makes

no mention of the need for follow up regarding a catastrophic cardiac event.  And once Mr. Silva

wrote the grievance claiming a "deteriorating medical condition," ECF No. 95-3 at 17, Dr.

Valicenti saw him a week later, performed a physical examination and ordered an x-ray and an

---

[16] While Mr. Silva's proffer is certainly sufficient for a fact finder to conclude that he experienced the very troubling
sensations he claims he described to the nurse, without more, that does not permit the inference that he had just
experienced a medically verifiable "major heart" episode.  <u>See</u> <u>Edwards v. Graham Cty. Jail</u>, 1:16-cv-315-FDW,
2017 WL 5894496, at *5 (W.D.N.C. Nov. 29, 2017) (layperson's testimony about having a heart attack is "not
competent evidence"; diagnosis of myocardial infraction requires expert testimony).

EKG, all of which yielded entirely normal findings.[17]  Id. at 24-25.  Accordingly, I find that Mr. Silva has also failed to proffer facts sufficient to make his second claimed delay trial-worthy.

A final reason why Mr. Silva's proof fails at Prong One – as to both claimed delays – is because the record is bereft of medically verifiable evidence of a cardiac event, or any harm associated with a cardiac event or other adverse medical event that is either linked to the delay in the administration of blood pressure medication or that occurred during or as a result of whatever happened during the night of September 21-22, 2019.  Shepard, 2018 WL 5281419, at *3; see Edwards, 2017 WL 5894496, at *6 (motion for summary judgment granted because detainee failed to present "competent evidence" that the delay in treatment for alleged heart attack resulted in any harm or worsened condition); Morphis, 2017 WL 1128463, at *11 (plaintiff "has provided no objectively verifiable evidence that he was harmed by any delay in treatment for his . . . cardiac issues"); Voyles v. Dobbs, No. 1:07CV42 LMB, 2008 WL 2783228, at *3 (E.D. Mo. July 15, 2008) (summary judgment granted despite nine-day delay without blood pressure medication due to lack of evidence that delay had detrimental effect on medical condition).  Rather, the record contains Mr. Silva's many normal clinical findings on examination, his normal chest x-rays and his normal EKG findings, as well as the file-review-based medical opinions of Dr. Berk that Mr. Silva did not experience a heart attack, of Dr. Clarke that Mr. Silva did not have a "major heart incident," and of Dr. Clarke, Dr. Berk and Dr. Keller that he received adequate ("exemplary" according to Dr. Keller) medical care.  ECF Nos. 48; 90; 93-7.  No contrary expert opinion has been provided.

---

[17] Mr. Silva claims that a RIDOC staff person told him in early November 2019 that RIDOC policy barred him from having a chest x-ray or an EKG because he was not sentenced.  ECF Nos. 95-3 at 17; 99 ¶ 11.  Mr. Silva is right that such a policy would pose a concern of constitutional dimensions.  Mr. Silva's problem is that, whatever an unnamed RIDOC staffer may have said, the undisputed evidence establishes that no such protocol was applied to Mr. Silva in that he was given an appointment (on November 25, 2019) with Dr. Valicenti who promptly ordered the x-ray and EKG.

To overcome these evidentiary deficiencies, Mr. Silva asks the Court to consider cases holding that a delay in medical treatment amounted to a constitutional deprivation.  However, these cases do not support his claim because each features a delay that is causally linked to an objectively serious harm.  See, e.g., Mata v. Saiz, 427 F.3d 745, 754-55 (10th Cir. 2005) (delay in treating chest pain led to heart attack and permanent and irreversible damage); Boyd v. Knox, 47 F.3d 966, 969 (8th Cir. 1995) (delay in providing dental care resulted in swollen mouth and impacted, pus-oozing infected wisdom tooth); Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir. 1990) (delay in ordering cardiac evaluation for prisoner's complaints of chest pain and other cardiac symptoms resulted in death by heart attack), overruled in part on other grounds, Farmer v. Brennan, 511 U.S. 825 (1994).

Factually, Mr. Silva tries to overcome the lack of any medically verifiable injury causally linked to the delays with his allegation that he observed the November 25, 2019, x-ray and that it (in his lay opinion) had a "'dark spot'" near the heart.  ECF No. 95-4 at 2.  He argues that the x-ray should be seen by a jury, which might find that the spot is heart damage caused by the five-day interruption in the dispensing of blood pressure medication.  This argument fails because the interpretation of an x-ray is not something that a lay person (such as Mr. Silva) is qualified to do. See Doherty v. Corizon Health, No. 3:19CV420-HEH, 2022 WL 782777, at *4 (E.D. Va. March 14, 2022) (lay person not competent to testify about cause of medical conditions or to interpret medical tests); Donald M. v. Saul, 2:20-cv-0036-JDL, 2021 WL 2589179, at *3 (D. Me. June 24, 2021) (significance of x-ray beyond scope of layperson), adopted, 2021 WL 3234591 (D. Me. July 29, 2021).  Moreover, this x-ray was interpreted by a qualified medical professional (a radiologist) who opined that it shows "no active disease."  ECF No. 95-3 at 26.  With no contrary

opinion from a qualified radiologist, Mr. Silva's lay observation about a "dark spot" does not give rise to a trial-worthy factual dispute.

Similarly, Mr. Silva points to Dr. Valicenti's decision in February 2021 (over a year after the alleged delays) to add Metoprolol because Mr. Silva's blood pressure was no longer adequately controlled by Lisinopril as evidence of a serious adverse health effect that a fact finder might conclude is causally linked to the delays.  Mr. Silva also claims that he saw "recoverable" readings from the April 2021 heart monitoring and interpreted them as reflecting heart palpitations – he argues that a jury may hear his lay analysis of these readings and find not only that he had developed heart palpitations, but also that this new symptom is causally linked to the delays.  ECF No. 99 ¶ 29.  These arguments fail for the same reason – only an expert can opine regarding these causal links; they are beyond the ken of a lay witness like Mr. Silva.  With no such expert opinion, these arguments fail to deflect summary judgment.  See Doherty, 2022 WL 782777, at *4 (lay person not competent to testify about cause of medical conditions or interpret medical tests); Hill v. Clark, 1:13-cv-00386-EPG-PC, 2016 WL 696433, at *1 (E.D. Cal. Feb. 22, 2016) (plaintiff not permitted to give medical opinion or interpret medical records that require expert testimony).

Finally, the Court need not linger long over Mr. Silva's argument that RIDOC's prescribing of Lisinopril amounts to a constitutional deprivation because Lisinopril was the wrong medication, and he should have been prescribed Metoprolol.[18]  ECF No. 98 at 11; 99 ¶¶ 14, 25.  This argument fails because, even if the Court assumes a fact finder would accept Mr.

---

[18] Mr. Silva also relies on his claimed recollection that the "Metoprolol Information Sheet" stated that an abrupt cessation of Metoprolol could cause death.  ECF No. 98 at 9-10.  That statement is hearsay, which may not be considered at summary judgment; nor is there any evidence that RIDOC staff were made aware that Mr. Silva claimed to have been prescribed a medication that would create the risk of death if there was an interruption in dosage.

Silva's claim that he was taking Metoprolol when he was released from BOP custody, it is undisputed that the prescriber prior to RIDOC was not BOP, but the Wyatt, which undisputedly had treated Mr. Silva with Lisinopril. It is further undisputed that, at the ACI, during late 2019 and throughout 2020, when Mr. Silva's blood pressure was measured, Lisinopril was found to be providing adequate control. And there is not a scintilla of proof permitting the inference that RIDOC's medical decision to prescribe Lisinopril, which Mr. Silva had taken at the Wyatt, instead of Metoprolol, which he took while at a BOP facility, was contrary to the relevant standard of care, was medically inadequate treatment, posed any risk of harm or resulted in actual harm.[19]

There is no need to go further. While a fact finder may well conclude that, for several days, RIDOC staff failed to do anything to verify with the Wyatt what blood pressure medication the Wyatt had prescribed for Mr. Silva and then delayed for two more days before regularly dispensing it, as well as that Mr. Silva complained to a nurse about serious symptoms, yet she made the medical judgment not to refer him to see a physician, there is no evidence permitting the inference that these delays amounted to a failure to address an objectively serious medical need, that they gave rise to "impending harm, easily preventable" or that they resulted in any serious adverse effects. See Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011) (internal quotation marks omitted). With "no evidence of treatment so inadequate as to shock the conscience," I recommend that "summary judgment is appropriate." Rua, 52 F. Supp. 3d at 97 (quoting Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir.1991)).

    B.    <u>Prong Two – Deliberate or Reckless Indifference</u>

---

[19] Mr. Silva's new fact, which he introduced in his unauthorized sur-reply – that he told the nurse and Dr. Valicenti that he wanted Metoprolol and that Lisinopril had been counterproductive – if considered, would not alter this conclusion. See n.14 *supra*.

With no objective evidence that Mr. Silva received constitutionally inadequate healthcare for a serious medical need, the Court's analysis could end and summary judgment in favor of Dr. Clarke should enter.  Nevertheless, because the Court may not adopt my Prong One recommendation, I have also considered Prong Two, which directs the Court's attention to Dr. Clarke's subjective knowledge.

Prong Two asks whether the evidence permits a finding of deliberate indifference to an inmate's known medical needs.  Barrett, 292 F. Supp. 2d at 285.  Because Dr. Clarke did not provide hands-on medical treatment to Mr. Silva,[20] this inquiry must examine whether she directed or otherwise had knowledge of allegedly inadequate care provided by others.  See Guadalupe-Baez v. Pesquera, 819 F.3d 509, 515 (1st Cir. 2016) ("a supervisor may not be held liable under section 1983 on the . . . theory of respondeat superior, nor can a supervisor's section 1983 liability rest solely on his position of authority").  Her liability must be premised on her own acts or omissions despite actual or constructive knowledge of the grave risk of harm, evincing reckless or callous indifference to Mr. Silva's constitutional rights.  Id.; see Daggett, 2021 WL 868713 at *40.  There must be a solid causal link between her conduct and the violation.  Daggett, 2021 WL 868713, at *40 (citing Guadalupe-Baez, 819 F.3d at 551); see Rua, 52 F. Supp. 3d at 97-98 (when no evidence that prison physician knew of staff medical error, summary judgment should enter).  If her liability is based on lack of training or supervision of nurses, physicians or other prison employees, Mr. Silva must present evidence permitting the

---

[20] There is no evidence suggesting that Dr. Clarke was directly involved in Plaintiff's medical care; in her Interrogatory Answers 6 and 17, she avers that she was not.  ECF No. 93-7 at 2, 13.  Mr. Silva has not asserted that she was.  The Court does not credit Mr. Silva's somewhat bizarre argument that, because Dr. Clarke's attorneys propounded discovery seeking his medical records to defend this case, she formed a doctor/patient relationship with him after she left RIDOC's employ.

inference that the inadequate training or supervision at least partially caused his injury.  <u>Rua</u>, 52

F. Supp. 3d at 97-98.

 Here, there is evidence to establish that Dr. Clarke was aware of and endorsed RIDOC's

intake protocol of verifying certain medications (specifically including blood pressure

medication) before issuing a new prescription, as well as her knowledge that this protocol

generally resulted in a delay before the medication arrived of approximately three days.  Clark

Aff. ¶¶ 3-6; <u>see</u> Clarke Int. Ans. 27, ECF No. 93-7 at 7 ("I am aware that there are issues at times

with inmates not receiving their medications immediately upon arrival at the ACI and this is

usually due to the inmates not knowing what medications they are taking or delay in receiving

confirmation of medications from the prescribing provider.").  However, there is no evidence to

permit the inference that this protocol is not medically appropriate for preventing medical error,

as Dr. Clarke avers, or that such an interruption in taking blood pressure medication is

inconsistent with appropriate standards of care.  <u>See</u> Clarke Aff. ¶ 5.

 Regarding Mr. Silva's allegations of inadequate medical treatment, there is nothing to

suggest that Dr. Clarke was aware at the time that the expected delay of three days had extended

to seven days without Lisinopril in Mr. Silva's case (possibly due to RIDOC staff negligence).

Dr. Clarke's Supplemental Interrogatory Answer 27 specifically denies that she was aware "of

plaintiff's delays in obtaining medication at the time of the alleged delay" and Mr. Silva presents

nothing to contradict her averment.  Clarke Supp. Int. Ans. 27, ECF No. 93-7 at 11.  Nor is there

any suggestion that Dr. Clarke was aware at the time of the serious symptoms Mr. Silva claims

he reported to the nurse on September 22, 2019 (and she has denied any such knowledge in her

Interrogatory Answers Nos. 8-9, ECF No. 93-7 at 3).  Nor is there evidence that Dr. Clarke was

aware at the time of this nurse's medical assessment (based on taking his vital signs) not to refer Mr. Silva to an emergency room or for an evaluation by a physician.

The earliest that the evidence permits the inference of Dr. Clarke having knowledge of Mr. Silva's medical issues is November 17, 2019, when he addressed a "Grievance" to her alleging that RIDOC staff were not consistently providing his blood pressure medication and had refused treatment for his "deteriorating medical condition" because he was not sentenced.  ECF No. 95-3 at 17.  However, far from recklessly disregarding the concerns Mr. Silva expressed in this grievance, the recipient[21] wrote a hand note dated the next day indicating that Mr. Silva was already on the list to see the doctor (which he did eight days later).  Id.  And the first that Dr. Clarke allegedly became aware of Mr. Silva's claim of "the major heart ailment that I experienced on 9/21-22/19" is November 25, 2019, when Mr. Silva claims he spoke to her about it.  See ECF No. 95-4 at 1.  Importantly, November 25, 2019, is the same day that Dr. Valicenti performed a physical examination of Mr. Silva that focused on his cardiac complaints, including Mr. Silva's description of the events of September 21-22.  Dr. Valicenti ordered an x-ray and EKG, both of which were immediately done and yielded entirely normal results.  That is, if Mr. Silva's evidence is accepted as true, it establishes that, at the earliest point that a fact finder might conclude that Dr. Clarke was alerted to Mr. Silva's complaint of not getting his blood pressure medication or of the lack of a physician evaluation of a serious cardiac event during the night of September 21-22, 2019, he was seen soon after by a qualified medical professional and any heart issues were ruled out.

---

[21] The evidence does not reveal whether Dr. Clarke saw this note or who wrote the response.  Drawing inferences in favor of Mr. Silva, as required at summary judgment, I assume that Dr. Clarke became aware of the grievance soon after it was written because Mr. Silva wrote her name on it.

I find that the summary judgment record contains nothing from which a fact finder could conclude that Dr. Clarke's conduct amounted to "an unnecessary and wanton infliction of pain" or was "repugnant to the conscience of mankind." Estelle, 429 U.S. at 105, 106 (internal quotation marks omitted).  Even if a fact finder somehow were to conclude that there was a medically unreasonable lapse in Mr. Silva's receipt of blood pressure medication on September 17-21 and 23-24, 2019, or that the nurse on September 22, 2017, deviated from the standard of care in failing immediately to send Mr. Silva back to see the doctor, there are no facts permitting the inference that Dr. Clarke acted intentionally, recklessly or even carelessly, to cause either delay.  Jones v. Martin, 9 F. App'x 360, 362 (6th Cir. 2001); Lozada v. MPCH, 355 F. Supp. 3d 58, 65 (D. Mass. 2019).  With no personal involvement in, no direct responsibility for, no actual or constructive knowledge of and no reckless or callous indifference towards either of the delays that Mr. Silva claims as constitutional violations, I recommend that Dr. Clarke's motion for summary judgment be granted "on this basis, alone." Voyles, 2008 WL 2783228, at *3.[22]

V.      **CONCLUSION**

Based on the foregoing, I recommend that Dr. Clarke's motion for summary judgment (ECF No. 93) be granted and that the Court enter judgment in her favor and terminate this case. Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United

---

[22] A coda: because my Prong Two recommendation relies on the traditional Eighth Amendment rubric, I have not separately discussed why Mr. Silva's evidence is insufficient to permit a fact finder to conclude that Dr. Clarke acted with objectively reckless disregard of a serious medical concern.  To be clear, if the Court were to adopt the objective standard, my recommendation remains the same – Mr. Silva's claim against Dr. Clarke should fail.  Est. of Vallina v. Cty. of Teller Sheriff's Off., 757 F. App'x 643, 647 (10th Cir. 2018).

States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor

Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
April 12, 2022